I t GRISBAUM, Judge.
This appeal arises from the juvenile court’s judgment annulling the adoption of M.S., a minor child, and granting the biological father permanent sole custody of M.S. We reverse.

ISSUES

The adoptive parent ultimately calls upon us to determine the following:
(1) Did the juvenile court err in concluding that the biological father’s action to annul the surrender had not prescribed, and
*1189 (2) Did the juvenile court err in finding that the biological father demonstrated parental fitness and a substantial commitment to parenting as required by La. Ch. Code art. 1138?
| .FACTS
M.S. is a 5/Lmonth-old child, who is the focus of a very bitter custody battle between his adoptive mother, who has present custody of him, and his biological father, who wants custody. The child’s biological mother and father lived together for approximately the first trimester of her pregnancy in the biological father’s parents’ home in Texas. When the couple broke off their relationship, the biological mother moved to Louisiana and into the home of a boyfriend, after a brief stay with her father in Texas. The biological father continued to live in Texas with his mother, father, two brothers, one brother’s wife, and two children.
M.S. was born on October 7, 1999, in Gretna, Louisiana. On October 12, 1999, the biological mother voluntarily terminated her parental rights and executed an act of surrender under which she immediately gave physical and legal custody of M.S. to the adoptive mother. The biological mother’s boyfriend, and the person with whom she lived for approximately five months of the pregnancy, also executed an act of surrender, allegedly believing he was the father of the baby.
Several days after the birth and surrender, the biological mother spoke by telephone with her grandmother and mother. She informed them about the birth and subsequent surrender. Both women were very upset about the surrender and asked her how they could reverse the adoption and gain custody of the baby. She informed them that legally only the biological father could do so. The mother and grandmother immediately contacted the biological father to apprise him of the situation, stressing that they wanted to get the baby back and that he was the only person who could achieve that.[1] •
[.The biological father obtained legal counsel in Texas and was advised that he should retain an attorney ■ in Louisiana. Through counsel, he requested .notice of the surrender. The adoptive mother served him with notice of the surrender via personal service upon his attorney. He filed an opposition to the adoption and a petition for habeas corpus. The adoptive mother then filed an Exception of Prescription, to which the .biological father responded with an Exception of Improper Service. The juvenile judge, granted the Exception of Improper Service and overruled the Exception of Prescription. After a hearing on the opposition, the trial judge ruled in favor of the biological father, annulling the adoption and granting custody of M.S. to the biological father; The juvenile judge granted the adoptive mother a stay on her order to surrender M.S. We extended that stay during the pendency of our ruling.

LAW AND ANALYSIS-ISSUE ONE

The appellant, the adoptive mother, first contends that the trial court erred in failing to find that the biological father’s action to annul the surrender of M.S. has prescribed. We agree.
Under La. Ch.Code art. 1137, an alleged biological father has 15 days from service of the notice of surrender to oppose an adoption. If the father resides outside of this state, service of the notice of surrender must be executed by either certified or registered mail. La. Ch.Code art. 1134. The record shows that here, service was executed by private process server upon the biological father’s attorney through his secretary on December 7, *1190 1999.[2] The biological father did not file his opposition until January 28, 1999, which was 36 days beyond the 15-day period. In overruling the adoptive mother’s exception of prescription, the juvenile judge found that service of the notice of surrender was improper. Although we agree with that finding, we find that the biological father’s | ¿action nonetheless prescribed.
La. Ch.Code art. 1147 provides that “[n]o act of surrender shall be subject to annulment except upon proof of duress or fraud, notwithstanding any provision of law to the contrary.” Importantly, however, Article 1148 provides that “[n]o action to annul a surrender shall be brought for any reason after ninety days from its execution or after a decree of adoption has been entered, whichever is earlier.” La. Ch.Code art. 1148.
The execution of the surrender was complete on October 12, 1999. The biological father filed his opposition to the surrender on January 28, 2000, approximately two weeks after the 90-day period had expired. Therefore, the action to annul was untimely. The juvenile judge acknowledged the untimeliness of the biological father’s opposition in her thorough reasons for judgment yet declined to conclude that the action had prescribed. She cited the biological mother’s behavior as her reason: “While the Court would agree that the time for bringing an action for annulment of the surrender has expired, and would further agree that no such action was filed by or on behalf of A.E., the court cannot ignore the fraudulent actions committed by A.S. and F.H. and the detrimental consequences of those actions.”[3] La. Ch.Code art. 1147 clearly provides that the only time a surrender may be annulled is in a case of fraud or duress. Article 1147, therefore, provided an adequate remedy for this biological father’s claims of fraud by this biological mother, provided that he brought his claim within 90 days of the surrender, which he did not do.
The appellee argues that Article 1147 only applies to a biological parent, who actually surrendered a child, and not to a biological parent, who did not agree to the surrender. We disagree. We find, given the precise facts presented here, and especially considering the strong public policy in favor of | .¡adoptions, that the 90-day time period applies to this biological father.
The record shows that the biological father knew when the biological mother’s expected due date was and how to reach her, both before and after the child’s birth, at her father’s home in Texas and at her boyfriend’s home in Louisiana.[4] Moreover, the record shows that approximately three days after the surrender, the biological mother’s family informed the biological father that M.S. was born on October 7, 1999 and, very significantly, that the biological mother surrendered M.S. on October 12, 1999. Yet, he did not file a Request for Notice of Surrender until over a month later. Furthermore, the adoptive parent promptly served the biological father with the Notice of Surrender, yet he did not file an opposition to the adoption until January 28, 2000, which was nearly two months after he was served with the Notice and approximately two weeks after the 90-day period prescribed.
*1191 Although we, too, find that service was effected by an improper method,- we conclude that the biological father had more than adequate notice of the surrender and nearly the entire 90-day period to voice his objections, yet he failed to do so. Because the biological father failed to file his opposition within the time period set forth by law, his action to annul the adoption prescribed.
Our well-established public policy supports this conclusion. The First Circuit has articulated the policy considerations affected by adoptions, which we adopt:
Similarly, we believe that in limiting the time within which a surrendering parent may re-claim his or her child and in limiting the reasons for which a surrender of parental rights may be annulled (i.e. only for duress, fraud or incompetency of the surrendering parent), the legislature intended to protect the stability of the adopting family unit as well as the stability of the child’s life. Thus, the legislature chose to prohibit an action to annul a | ^surrender brought for any reason after ninety days from its execution.
State In Interest of Taylor, 637 So.2d 512, 514 (La.App. 1st Cir.1993) (emphasis in original).
Additionally, although not binding, the comments to Article 1148 show the legislative intent in enacting such a prescriptive period in the context of adoptions:
As the supreme court recognized in In re J.M.P., 528 So.2d 1002 (1988), the public policy of this state is to achieve stability and permanence for a child at the earliest possible time while, at the same time, according due deference to the fundamental rights of the adult parties to an adoption proceeding. The overriding purpose of the revision of the adoption laws accomplished by this Title is to minimize the potential that a surrender might be successfully challenged on grounds of involuntariness or lack of full knowledge of its consequences. With the addition of these new safeguards to the surrender process, a ninety day period in which to assert or lose any claim of fraud or duress seems fully justifiable.
Louisiana jurisprudential authority also exists to support this strong underlying policy of finalizing adoptions. In, State In Interest of Taylor, the First Circuit held that a biological mother, who executed an act of surrender, was barred from bringing an action to nullify that surrender on the basis of her lack of capacity after the 90-day time,period set forth in La. Ch.Code art. 1148 had expired. 637 So.2d 512 (La.App. 1st Cir.1993). In so holding, the First Circuit noted: “In the Voyles case, this court held that the phrase ‘for any reason’ means what it says, and that after the expiration of the designated time period, a petitioner cannot seek the nullity of a parental surrender even if the , proceedings were an absolute nullity.” 637 So.2d at 514. We interpret this case as authority for our conclusion that the 90-day time period to annul an adoption is absolute and without exception.
Finally, application of La. Ch.Code art. 1148 to only those parties who actually executed acts of surrender would lead to absurd consequences, |7especially in circumstances such as these, where the non-surrendering parent had actual notice of the surrender within a few days of its occurrence and failed to act within the prescribed period. There would then be no safeguards to prevent a biological father from successfully annulling an adoption ten or 15 years after it took place, and forcing the adoptive mother, who has raised the child into his teenage years, to relinquish custody of 'the teenager, to his biological father. We do not believe our law demands such absurdity. We, therefore, acknowledge and adopt the redactors’ stated purpose in enacting Article 1148, of *1192 providing a permanent stable home for children at an early age, while upholding the fundamental rights of all parties involved. We thus find that the biological father’s action to annul the surrender of M.S. prescribed before he filed his action. For the sake of complete resolution of all issues involved in this very serious matter, we address the remaining issues raised by the appellant. Our findings on these issues further support the ultimate outcome here.
ISSUE TWO — LAW AND ANALYSIS
The appellant alternatively contends that, if the biological father’s action to annul the surrender has not prescribed under La. Ch.Code art. 1148, the trial court erred in concluding that the biological father demonstrated parental fitness and responsibility sufficient to be granted custody. We agree.
La. Ch.Code art. 1138 sets forth the alleged father’s burden at the hearing on his opposition to a surrender:
A. At the hearing of the opposition, the alleged or adjudicated father must establish his parental rights by acknowledging that he is the father of the child and by proving that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent of his child.
B. Proof of the father’s substantial commitment to his parental responsibilities requires a showing, in accordance with his means and knowledge of the mother’s pregnancy or the child’s birth, that he either:
(1) Provided financial support, including but not limited |sto the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child.
(2) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing and able to assume legal and physical care of the child.
The alleged father must, therefore, prove three things: 1) that he is the child’s father, 2) that he has manifested a substantial commitment to parental responsibilities, and 3) that he is fit to raise the child. It is undisputed that the appellee is M.S.’s biological father.[5] The criteria of parental fitness and substantial commitment to parental responsibilities, however, are vigorously contested and the facts surrounding each are disputed in their entirety.
We acknowledge, with due deference, the juvenile judge’s factual findings; however, we find them manifestly erroneous. Upon a very comprehensive review of the record, we make the following findings of fact, as they are relevant to both a manifestation of fitness and commitment to parental responsibilities.
The appellee is a 25-year old of Hispanic origin and permanent resident alien status, with an expired visa. He lives in the rural community of Alvin, Texas, in what has been described as a five-bedroom trailer with one bathroom and no telephone. He lives with, at the least, his two brothers, one sister-in-law, two nephews, and his mother and father. He quit school at age 18, after the ninth grade. He has never had a driver’s license, though he *1193 He has three other their grandmother and custodian, if she does drive regularly, children, none of whom live with him. He does not know the | ¡¡whereabouts of one of his children. The other two children live with their maternal grandmother, approximately 45 minutes from where he lives. He has provided very little support for their care and has not traveled to see them in one and one-half years.[6] According to does not bring the kids to him, he does not make the effort to see them. He has, however, had relatively lengthy visitation periods with them. When they visit their father, they have to sleep in a bed with him, as there is no where else for them to sleep. When they have visited him in the past and he had other commitments, the children stayed either with his parents or with a prior girlfriend’s parents. He, or perhaps his parents, have, however, sent various toys home with the children after visits and have bought the children Christmas gifts.
Although the appellee claims he has never been in a gang and is not presently in a gang, there is substantial evidence that he either is in a gang or has significant gang affiliation. The juvenile court properly certified Chief Robert Schoener of the Galveston Police Department as an expert in gang investigations, gang intelligence, gang enforcement, and gang psychology. Chief Schoener was employed by the Alvin Police Department from January 1987 until May 1998. He testified that, based on his personal knowledge, the appellee is a self-admitted member of a gang called Brothers With Attitudes (B.W.A.) and has numerous tattoos of gang symbols. He described the appellee as a tagger for the gang, which is a position of relatively high importance in the gang. According to Chief Schoener, taggers spray paint the gang’s symbols in public places to mark their territory and to intimidate other gangs. Chief Schoener testified that, when he oversaw gang activity in Alvin, the appellee was arrested and pled guilty with another person for spray painting | ingang-related symbols on a building. The appellee contends that, although the other person arrested with him may have been painting gang symbols, he only painted a Snoopy figure and that Snoopy was his nickname in high school because he was so slow. According to Chief Schoener, Snoopy was his moniker, or street name.[7] As Chief Schoener left the Alvin Police Department in 1998, he has no present knowledge of recent arrests for gang activity; however, he explained that, just because a person is not arrested for illegal activity, it is not necessarily true that he is no longer a gang member. According to Chief Schoener, it is almost impossible for gang members to disassociate themselves with the gang. Presented with Chief Schoener’s wealth of information on gangs, as well as Chief Schoener’s personal knowledge of the appellee’s involvement with a gang, the juvenile judge found that the appellee is currently an inactive member of B.W.A.[8]
We find Chief Schoener’s testimony entirely credible and the appellee’s testimony entirely incredible as to his gang involvement. It is entirely inconsistent for the appellee to claim no present or past gang affiliation although he is tattooed with gang symbols, has spray painted gang symbols in public places, and, most signifi *1194 cantly, admitted to Chief Sehoener that he is a B.W.A. member. And, of additional significance is the fact that his two brothers, who live in the same house as the appellee, are also gang-affiliated. This probable gang affiliation of both the appel-lee and residents of the house where he lives and M.S. would live, if the appellee is awarded custody, is, without a doubt, substantially relevant to the appellee’s demonstration, or lack thereof, of parental fitness.
|uIn addition, there is also evidence of drug and/or alcohol use by both the appel-lee and his father, with whom he lives. Despite testimony to the contrary by the appellee and his family, the evidence of such behavior raises a question as to his lack of parental fitness.
We find that, based oh the entirety of the evidence, the appellee has not met his burden of proving parental fitness necessary to have custody of M.S. Furthermore, the evidence clearly shows that he lacks a substantial commitment to his parental responsibilities. Under La. Ch. Code art. 1138, proof of this commitment requires a showing that he provided consistent financial support to the mother during the pregnancy or contributed to her medical expenses or those of the child after his birth. The record does not establish such a commitment. Providing his parents’ home for the biological mother to' live for one trimester of her pregnancy and buying her a couple of baby-related items is insufficient to establish a long-term commitment. The appellee asserts that, because the biological mother was on Medicaid her entire pregnancy, she did not need his financial assistance with medical expenses. The record shows that the ap-pellee had medical benefits through his employer, yet he never suggested to the biological mother that, if possible, she and their child be covered by his insurance. Furthermore, after the biological mother and the appellee broke off their relationship, the appellee knew where to locate her through her letters to him and through his frequent contact with her family; however, he never offered to send her money, or even inquired about her financial state. That lack of concern shows utter disregard of parental responsibilities.
The appellee contends, as the juvenile court found/that he was thwarted in his efforts to provide such support, and he is now willing and able to assume both legal and physical care of this child. We believe that, although the biological mother was not entirely forthright, and we certainly do not condone her actions, 'she did not prevent him from demonstrating a genuine interest in the | ^well-being of his unborn child. As previously addressed, although the biological mother did move out of state after she and the appellee broke off their relationship, he made no bona fide attempts to contact her, despite several avenues available for contact. And, very significantly, he was completely aware that his child would be born sometime in October, but he had made no arrangements to see that child, or to address custody matters with the biological mother. Surely, a father who was substantially committed to his parental responsibilities would at least contact the mother either prior to or immediately upon learning of the birth to discuss custody, or even visitation, of that child. The appellee made no such efforts. In fact, had the biological mother’s mother and grandmother not informed him of the birth and the surrender and, at least, strongly suggest that he.oppose the adoption, there is no proof that he would have ever attempted to seek custody of, or even see, this child.
The appellee cites as proof of his commitment to paternity the fact that he purchased numerous baby items from a relative and prepared his bedroom with a baby crib, yet there is no proof that he purchased these items or, if he did purchase *1195 them, that he purchased them in anticipation of the birth, instead of after the surrender. Ordinarily, a father’s purchase of baby items demonstrates some interest in caring for the child. However, here, the sole evidence concerning the purchase of these items is the testimony of a party whom we have found lacks credibility.
Under La. Ch.Code art. 1188, a father has the burden of proving that his commitment is substantial. We find, based on the above reasons, that, although the appellee has perhaps demonstrated a slight commitment to parental responsibilities, he has far from proven that his commitment is substantial. Accordingly, we find that this father is unfit and lacks a substantial commitment to parental responsibilities.
While we acknowledge the detailed statutory scheme for adoptions, we |13believe other factors must necessarily influence our decision to determine proper custody for this child. The overriding concern in the entire arena of family law where children are affected is what is in the child’s best interest. La. Civ.Code art. 131. Here, too, this child’s best interest is absolutely our most important concern. Of particular significance is the fact that the court-appointed advocate for M.S. recommended that the adoptive mother retain custody. We believe her opinion is entitled to substantial weight, as she is a person undoubtedly solely looking out for this child’s best interest.
Primarily, however, we look to the expert opinion of Dr. Allison Steiers, a clinical psychologist, qualified by the juvenile court as an expert in the field of mental health and infant attachments. According to Dr. Steiers, infants go through several phases of development. The two most relevant for this child are those from three to six months of age and from six to nine months of age. During the three to six-month phase, infants begin to make more discriminations about their caretakers and become more focused on familiar adults. During the six to nine-month phase, infants develop a focused attachment on their primary caretaker and begin to experience distress at the loss of that person. This is the phase where infants form permanent psychological bonds. In this phase, permanently removing a child from his primary caretaker will likely cause irreversible psychological damage, and is completely discouraged. If, however, a child is permanently removed from the care of his primary caretaker at ages three to six months, the child should attach to the new caretaker, with the proper transition.
As M.S. was born on October 7, 1999, and is currently 5/& months old, he is bordering the two phases. Therefore, it is reasonable to assume that he has begun to form a permanent bond with his primary caretaker, and if he is permanently taken from her at this point, he would experience some level of psychological damage.
| 14A1so, according to Dr. Steiers, if the child is doing well where he is, she would definitely not recommend a change of custody. There is no evidence that this child is not thriving in his current environment. Furthermore, Dr. Steiers opined that a shared custody arrangement, where two or more people alternate custody of the child every several weeks or months, would cause developmental problems for a child, which appears to be the arrangement that the biological mother’s mother and grandmother have privately arranged with the appellee.
Although we do realize that a biological father’s right to raise his children is fundamental, we find that this biological father did not timely object to the surrender, that he has failed to prove substantial commitment to his parental responsibilities and parental fitness, and that this child’s best interests are best served by him remaining in the adoptive mother’s custody. More *1196 over, further support for our decision lies in this state’s public policy to promote adoption and find a permanent and stable home for adopted children as early as possible.
Accordingly, we reverse the juvenile court’s judgment, terminate the biological father’s parental rights, and grant the adoptive mother permanent, sole custody of M.S. Each party shall bear his own costs of this appeal.
REVERSED.

. The biological father was already aware of the biological mother’s expected due date as she wrote to him to specifically inform him of such, and he often saw her grandmother and mother, who also updated him on her condition.

. The appellee contends that no one at his attorney’s office was served with the Notice of Surrender, although the record reflects a return of service on the attorney's secretary.

. The judge was referring to her finding that the biological mother knew that her boyfriend was not the biological father when he executed his surrender.

.These facts are based on the biological mother’s letters to the appellee informing him of such and numerous conversations between the biological father and either the biological mother’s mother or grandmother.

. DNA testing revealed, with 99.9% accuracy, that the appellee is the biological father and entirely excluded the biological mother’s present boyfriend as the biological father.

. Testimony indicated that the appellee is currently on Texas’ dead beat dad’s list, although the actual list was not produced at the opposition hearing.

. Chief Schoener gave detailed testimony about gang members’ use of monikers, which is the official term for street names.

.The judge based this conclusion on the fact that he has had no gang-related convictions in two years, which is the time period used to switch people , from active to inactive gang status. A recent arrest, however, will most likely change his status back to active.