1 iBOWES, Judge.
Appellants, M.D.S.G. (“M.”) and P.B.S. Jr. (“P.”), appeal a judgment of the Juvenile Court declaring that the child K.N.K. could not be released for adoption without the consent of her natural father, J.J.K. (“J.”).
Appellants filed a petition for the adoption of K.N.K. (“K.”), born on August 12, 1995 to J. and S.D.S.G. (“S.”), an unmarried couple. Appellants are married and M. is the child’s maternal aunt; the petition alleged that the mother, S., consented to the adoption. It was further alleged that the whereabouts of the father, J., were unknown and requested that a curator ad hoc be appointed to represent him at the proceedings:
l2In the petition it was averred that the child had lived in appellants’ home since September of 1995, with the consent of her mother. The petition stated that, although the father had executed an acknowledgment of paternity, his consent to the adoption was *221 un necessary since the acknowledgment of paternity had never been recorded, and that no one was listed or registered on the ‘putative father registry as the father of the child. Attached to the petition was a copy of the child’s birth certificate showing J. as the father.
On March 31, 1997, the State of Louisiana through the Department of Social Services informed the court that J., the father, had contacted their agency and opposed the adoption, wishing to seek physical custody of the child. On April 1, 1997, J. filed a formal declaration of intention to oppose the adoption. In that pleading, he alleged that he had attempted to continue his relationship with the child but had been thwarted by the proposed adoptive parents through subterfuge, threats intimidation and/or peace bonds. Appellee averred that on two occasions he had to resort to the police to retrieve his daughter from appellants.

ACTION OF THE TRIAL COURT

The matter was set for hearing; during the course of. the proceedings, S. executed a voluntary surrender of K. Following the hearing the trial judge found that J. had established his parental rights to the child, and declared that under La. Ch. C. art. 1138, no adoption could be granted | ¿without J.’s consent. The court further ordered that the surrender executed by the natural mother be declared m valid and that any subsequent petition for custody of K. should be properly brought before the district court.
The trial court found that by executing an acknowledgment of the child, the father demonstrated a formal means of establishing a relationship with the child. The court further found that appellee had proved an informal acknowledgment by providing substantial parental care and support in the following actions: making preparations for the child at the time of the child’s birth; purchasing a baby bed and other items for the expected child; showing an interest in her by providing for her and being present at her birth; participating in the choice of her name, planning for her baptism, feeding, changing and tending to her. The court found that these actions established his commitment to parental responsibilities.
The court continued and found that the appellee, J., had met his burden of proving his fitness for parental responsibilities by the above actions, and the evidence of his own daily care of the child when she was in his custody. The court also noted that appellee had sought legal assistance to obtain custody of the child months before he was informed of the adoption proceedings. The court was satisfied with appellee’s completion of a 12 step program, a substance abuse program and Antabuse to control a previous drinking problem.
It is from this judgment that the appeal was taken.
1 ^EVIDENCE AND TESTIMONY
At the hearing appellee, J., testified that when he met S., the natural mother, she was three months pregnant with the child of another man; and that child was eventually adopted. Later, they planned to have a child together and she became pregnant. Appel-lee would take her to the doctor and asked her not to smoke during the pregnancy. When the baby was bom, appellee was present and held the infant. When the family returned home, appellee worked while (he believed) S. stayed home with the baby. In fact, he discovered later that M. would pick the baby up every day while S. played video poker.
During this time, shortly after the child’s birth, he bought a baby bed, Similac baby formula, Huggies diapers, clothes, etc. He changed her diapers and fed her, bathed her, changed her clothes. Together J. and S. chose the baby’s name, and planned her baptism.
One day S., who was supposed to be at work, disappeared, leaving the baby at M.’s house. Appellee later found out she had gone to Mexico, and when she returned the next day, she told appellee that she had taken LSD and Valium; she was incoherent and they had an argument. Appellee became upset, slapped S. and left.
The couple separated. S. wanted to allow the baby to stay with M. temporarily; appel- *222 lee thought that the baby was going to be with her mother for a time, but that when they established their own separate domiciles he | gwould take the child. He attempted to see the child for Christmas, but could not find her. Sometime later, M. asked if appel-lee would permit her to adopt the baby, but J. refused, stating that he wanted the child to live with him. He wanted to see his daughter for Christmas, but was unable to do so.
In February of 1996, after J. had his name placed on the birth certificate, he called the police to help him retrieve the baby from M. He did not act before that because of threats from S.’s family.
The child lived with appellee and his grandmother at which time he continued to care for her. S. would watch the baby while he was at work, and he would take the baby home afterwards. He described his daily care of the infant, feeding and cleaning her and taking care of her cold. This continued for three weeks until S. took the baby back with her to spend the night. S. then told appellee that the baby was with M. who still wanted to adopt the infant. Although he tried to obtain legal assistance, he did not have the money to pay an attorney to establish his paternal rights at that time. He did not see his daughter for several months because the family would take her away, and he was told he would be shot if he tried to see her. He learned of the impending adoption through the curator’s advertisement in the newspaper.
At the time of trial he was living with his fiance and was employed. He admitted that he was a binge drinker, but completed a twelve step | «program and, after a traffic incident, went to the Jefferson Parish Substance Abuse Center. He and his fiance both worked, but his grandmother would babysit at his home. He planned on sending the child to private school, and felt it would be no problem whatsoever to raise his daughter properly and take care of her “one hundred percent.”
He testified that he offered financial support to M. and P. but they refused.
Appellee’s grandmother testified that when he lived with her, he took care of the baby ■himself, feeding her, changing her, etc. She was willing to care for the baby now while appellant was at work.
Appellee’s fiance testified that she and appellant could provide a stable and loving home, and that it was her intention to do so.
S., herself, testified that when she lived with J., he drank to excess every day and also used marijuana. He would hit her and drag her by her hair when he was drunk; J. also hit her eleven year old sister when he was drunk. When S.’s mother intervened, J. attacked her and the police had to be called and J. was arrested. While J, supported her partially, her parents also bought food for the couple. J. did attend the delivery, but he was drunk at the time. After the baby was born, S. went to work on a part-time basis and M. cared for the baby during the day. J. would pick the baby up after work and he did not object to M.’s having the baby. In October, 1995, she went to Mexico to pick up a car, and J. was supposed to keep the Rbaby, but instead dropped her off at M.’s house. When she returned from Mexico, J., who was drunk, started punching her, knocked her down and threw a television set at her. He started beating her with a metal bar. Two days later, S. left to live with a friend and the baby stayed with M. Meanwhile, J. did not ask her to retrieve the baby and did not ask to see the baby. He never offered to take care of the child and never gave her any money or clothes for her. In February of 1996, J. threatened to have her arrested if she did not go with him to put his name on the birth certificate. J. went to pick up the baby so that he could see more of S., who kept the child during the day. He didn’t really pay attention to the baby. After a couple of weeks she told M. to come pick up the baby. In November of 1996, he called and insisted on seeing K., but she told him to call M.
On cross-examination she admitted that she obtained a prescription in Mexico for large amounts of Valium and some other drugs which she was taking; these drugs had not been prescribed for her by a physician in the United States. She admitted that J. was concerned with her smoking during the pregnancy; that they both considered the infant’s *223 name; that he both bought her some baby things such as the bed; and that they planned the baptism of the child. S. later testified that she consented to the adoption of the child by appellees.
M. testified that the infant has lived -with her since she was one month old, and knows her as “Mom”; K. does not know who appellant is and | «knows S. as her aunt. M. frequently saw J. drunk. Right after the baby was born, she began to stay with M. and her husband during the day, and J. would pick her up at night. In the beginning of October, 1995, K. stayed with them full time. M. saw her sister right after J. beat her up, and she looked terrible. J. did not call her about the baby, nor did he offer money or gifts for the child. S. came with the police to pick the baby up in November 1995, but after, two days asked M. to come get her because she could not care for the child.
From November of 1995, until the end of February, 1996, J. did not call or offer support. He did not try to see the baby. J. came with the police to pick up the baby in February, but M. saw her everyday at S.’s apartment. After a couple of weeks, S. again called and asked M. to pick up the child; K. has lived continuously with her ever since. Since March of 1996, J. has never called to see the baby, nor offered support. At one point she asked J. if she could adopt.K. and he told her he did not want the child to lose his last name, but that K. could live with her. At another time J. did agree to the adoption, but again changed his mind.
P., husband of M., corroborated the testimony of his wife. L., mother of M. and S., also testified as to the drunken behavior of appellant, and verified the incident in which appellant hit her younger daughter, as well as his beating of S. In October of 1995, J. told her that he talked to a lawyer about getting custody of K.
IsS.’s aunt testified that she was present when J. agreed to let appellees adopt the baby.

ANALYSIS

La. Ch. C. art. 1193 reads in pertinent part as follows:
Persons whose consent or relinquishment is required
Unless rights have been terminated in accordance with Title X or XI, consent to the adoption of a child or relinquishment of parental rights shall be required of the following:
* * * * * *
(3) The alleged father of the child who has established his parental rights in accordance with Chapter 10 of Title XI.
[Emphasis supplied].
Under La. Ch.C. art. 1137, a natural father must prove• certain facts to the court to establish his parental rights:
B. In order to establish his parental rights at the hearing provided in Article 1138, the alleged or adjudicated father must demonstrate to the court his affirmative efforts to establish or maintain a parental relationship with the child. Relevant evidence includes but is not limited to proof of attempted legitimation of the child, formal acknowledgment of the child, declaration of paternity filed in the putative father registry after July 1, 1992, adjudication of paternity by a court, or provision of substantial parental care and support to the child.
[Emphasis supplied].
lioLa. Ch.C. art. 1138 reads in relevant part:
A. Within twenty days after receiving notice of opposition from an alleged or adjudicated father, the court shall hold a hearing to decide if he has established or forfeited his parental rights. The court shall consider his fitness and his commitment to parental responsibilities, including his attempts to establish or maintain a relationship with the child.
B. If the court finds that the alleged or adjudicated father has established his parental rights, the court shall declare that no adoption may be granted without his consent and shall order the child to be in his legal custody.
[Emphasis supplied].
Thus, in order to establish his parental rights under the statutory scheme, the *224 unwed father must demonstrate Ms efforts to establish or maintain a parental relationship; he must farther show Ms fitness to be a parent and his commitment to parental responsibilities.
Our Supreme Court discussed the rights of an unwed father in Matter of R.E., 645 So.2d 205 (La.1994) as follows:
In accordance with this court’s decision in In re Adoption of B.G.S., supra, the statutes contemplate that the unwed father’s constitutionally protected interest in a parent-child relationship does not come into existence until the father demonstrates his fitness for parental responsibilities, commitment to those responsibilities, concrete actions taken to grasp his opportunity to be a father, and the potential for him to make a valuable contribution to the child’s development. Ch.C. Arts. 1137-1138.
[Emphasis supplied].
See also In re Adoption of B.G.S., 556 So.2d 545 (La.1990).
| nThe burden of proof is upon the father to show the preservation of Ms opportunity to establish parental rights by proving these interrelated elements by a preponderance of the evidence. Matter of R.E., supra; In re M.F. 95-649 (La.App. 5 Cir. 8/30/95), 660 So .2d 952.
In its excellent reasons for judgment, we find the trial court correctly determined that the father demonstrated both a formal and informal acknowledgment of the baby. Under La. C.C. art. 203, the acknowledgment may be made in the registering of the birth of the child, which was accomplished by appellant herein by having his name placed on the birth certificate. The trial court also considered his efforts to provide for the child after her birth and his interest in the baby by feeding her, etc. In this the trial court apparently made a credibility determination m favor of appellant and, therefore, the marn-fest error-clearly wrong standard demands great deference to the trier of fact’s findings. State in Interest of A.C., 643 So.2d 719 (La.1994); Pelican Plumbing Supply, Inc. v. J.O.H. Const. Co., Inc., 94-991 (La.App. 5 Cir. 3/28/95), 653 So.2d 699. Therefore, we hold that the trial court properly found that appellant did establish his parental relationship with K.
Relative to appellant’s parental fitness, an “unfit” parent is defined (as pertains to the present case) as one:
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other | ^health services .... Financial inability alone shall not constitute grounds for termination of parental rights.
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
Pertinent to the instant case is the history of appellant’s substance abuse as testified to by the witnesses, as well as the allegations of Ms physical abuse of S., appellant’s testimony relative to his completion of a substance abuse program was unrefuted and the court clearly felt that his drinking problem had been overcome. Importantly, the statute does not declare that any parent with a medical or emotional illness, mental deficiency, etc. is unfit; rather, the determination must be that any condition stated therein makes the parent unable or unwilling to provide an adequate permanent home.
The learned and experienced trial judge had ample opportumty to observe all the witnesses under oath and to determine their demeanor as they testified. The court evidently concluded that any problem which appellant had in tMs regard did not render Mm unable to provide for the child, and we cannot, based on the entire record before us, find manifest error in tMs determination.
|lsAs to the allegations of physical abuse of S, and the other violent incident testified to by the witnesses, it was clear from the testimony that these episodes occurred while appellant was intoxicated. The trial court apparently felt that resolution of J.’s alcohol *225 abuse remedied this behavior; and there was no evidence that appellant’s past behavior in this regard has continued into the present so as to constitute an established pattern of behavior.
Considering all the factors enumerated by the trial judge regarding appellant’s fitness, we can find no manifest error in his determination that appellant proved, by a preponderance of the evidence, that he did establish a parental relationship with his daughter and demonstrated his fitness also by a preponderance of the evidence.
We recognize the heartache inherent in all such cases wherein a child is loved by. more than one set of parents. Nevertheless, in the absence of manifest error, we have no choice but to affirm the trial judge because it construed the applicable law and jurisprudence correctly to the applicable facts that it found.
AFFIRMED.