764 So.2d 47 (2000)
In re A.J.F. Applying for Private Adoption.
No. 2000-CJ-0948.
Supreme Court of Louisiana.
June 30, 2000.
*48 Edith Henderson Morris, Deborah Margaret Henson, Wolff & Morris, New Orleans; David Jude Maraldo, Noel E. Vargas, II, Metairie, Counsel for Respondent.
Catherine Louise LaFleur, New Orleans, Terri McDonough Miles, Metairie, Counsel for Applicant.
KNOLL, J.[*]
This case concerns the opposition of a biological father to the private adoption of his newborn child. The issue of notice invokes a due process question with regard to the father's opposition to the adoption, the resolution of which highlights the tension between the notice provisions of the Louisiana Children's Code and the Legislature's desire for prompt adoptions so that adopted children might have a permanent and stable home as early as possible. We are additionally called upon to determine *49 whether the appellate court incorrectly applied the manifest error rule in its reversal of the juvenile court. For the following reasons, we reverse the judgment of the appellate court and reinstate the juvenile court judgment.

FACTS
In November of 1998, A.S.[1] began dating A.E., and soon began living with him at A.E.'s parents' home in Rosharon, Texas. Although the date was not firmly established in the record, A.S. learned in January of 1999 that she was pregnant and that the baby's due date was October 21, 1999. A.S. and A.E. had differing stories about his knowledge and acceptance of paternity. A.S. asserted that A.E. denied paternity when confronted with the pregnancy; to the contrary, A.E., his mother, and A.S.'s mother all testified that A.S. informed everyone that A.E. was the baby's father and that he looked forward to raising the child. Notwithstanding this dispute, the record establishes that A.S. continued to live with A.E. until April of 1999 and that he supported her. Shortly thereafter, A.S. left A.E.'s household and did not say where she was going. However, the facts show that a short time later, A.E. was arrested for breaking down the front door of A.S.'s father's trailer in an attempt to see her. He stated that his actions were taken in an attempt to speak with A.S. and were prompted by A.S.'s desire for an abortion. The record shows that even after A.S. left, A.E. thought that he would be raising the child after the birth. Under that assumption A.E. continued to purchase child care items and baby furnishings which he set up in his room at home.
When A.S. left, she rekindled a relationship with F.H., III. Earlier she and F.H. had lived together and a child was born of that relationship. Despite this reunion, the record shows that for a brief time in either late June or early July 1999, A.S. returned to live with A.E. because F.H. had struck her in the face. During this time, A.E. bought A.S. clothes and continued to provide her with food and shelter. Without telling A.E. where she was going, A.S. then left again and returned to live with F.H. in Gretna, Louisiana.
On October 7, 1999, almost three weeks earlier than anticipated, A.S. gave birth to a male child, M.S., at Meadowcrest Hospital in Jefferson Parish. A.S. listed F.H. as the baby's father on the birth certificate. Two days later, on October 9, 1999, F.H. executed a voluntary act of surrender in which he informally acknowledged paternity of the infant child and surrendered the child to Noel E. Vargas, an attorney who represented the prospective adoptive parent, A.J.F., and accepted the child's surrender on her behalf. On October 12, 1999, five days after the child's birth, A.S. also executed an act of surrender in which she attested that F.H. was the child's natural father, and then surrendered the child to Vargas, who accepted the surrender on behalf of the prospective adoptive parent. F.H. and A.S.'s acts of surrender, the supporting affidavits from the attorneys for the surrendering parties and the mental health counselor who counseled the parties together with the parties' genetic histories, as required by LA. CHILD. CODE arts. 1120-1121; 1124-1127, were recorded in Jefferson Parish on October 12, 1999. On the day that A.S. executed the act of surrender, the record shows that Vargas gave a $4,000 check to either F.H. or A.S. The record is unclear about who actually received it; nevertheless, it is undisputed that the check was made out to A.S. The record further shows that F.H. and A.S. used these proceeds to purchase an automobile, pay a past due telephone bill, and pay for F.H.'s traffic-related fines. This payment was in addition to other payments that A.J.F. made now and then during A.S.'s pregnancy.
Approximately one week after M.S.'s birth, A.S.'s grandmother told A.E. of the *50 birth and the acts of surrender that A.S. and F.H. executed. A.E. then consulted an attorney in Texas for information about his rights. After being referred to a Louisiana attorney, on November 15, 1999, A.E., a resident of Texas, executed and filed an authentic act for public record in Jefferson Parish wherein he acknowledged paternity of M.S. In addition, he filed the act of acknowledgment in the Putative Father's Registry on November 16, 1999.

PROCEDURAL HISTORY
On November 22, 1999, Terri Miles, A.E.'s attorney, enrolled as counsel of record in Jefferson Parish Juvenile Court and requested notice pursuant to LA.CODE CIV. PROC. art. 1913 (notice of signing of judgment), 1914 (notice of rendition of interlocutory order), and 1572 (written request for notice of trial). Pursuant to that request, the trial testimony reflects that on December 7, 1999, representative service of the notice of surrender was purportedly made by a process server leaving the notice with the receptionist for A.E.'s attorney at the law office.[2] Although this notice is not a matter of record, co-counsel for the prospective adoptive mother quoted the notice language during argument before the juvenile court judge. According to that transcription the notice stated:
To Mr. A.E., through his attorney of record, you may oppose the adoption of this child only by filing a written objection with this court in fifteen days after you receive this notice. If you file a written objection timely, the court will set a hearing within twenty days of filing the opposition. If you fail to file a written Motion of Opposition, the court will order the termination of any and all parental rights you may have and the child may be subject to adoption. (emphasis supplied by record).
The record preponderates that the first time A.E.'s attorney saw this notice was on January 26, 2000, when she received a faxed copy from the juvenile court. As the trial court noted, no opposition was filed within the fifteen (15) days immediately following the purported service of the notice in December.
At some point shortly after A.E. entered the picture, all of the parties' attorneys agreed that their clients would submit to DNA testing and that no pleadings requesting a hearing on the adoption or an opposition to the adoption would be forthcoming until the results of the DNA testing were received. ReliaGene Technologies, Inc. conducted DNA parentage testing on December 10, 1999 (A.E.), December 24, 1999 (M.S.), and December 27, 1999 (A.S. and F.H.). On January 26, 2000, the test results were released which showed conclusively that A.E., not F.H., was M.S.'s father.[3] Immediately thereafter, on January 28, 2000, A.E. filed a petition for habeas corpus and an opposition to the private adoption, naming A.S., F.H., and A.J.F. as defendants. In the pleading, A.E. alleged that contrary to the process server's return of service, neither he nor his attorney or her secretary was served with the notice of surrender. A.E. further alleged that the parties had agreed to wait on the DNA testing results *51 before filing further proceedings.[4] Because of the discrepancy in the service of the notice, the juvenile court issued a rule to show cause why the petition for habeas corpus and an opposition to the private adoption should not be dismissed. A.J.F., the prospective adoptive mother, filed a peremptory exception of prescription on February 4, 2000. In response to A.J.F.'s peremptory exception, A.E. responded with a declinatory exception of improper service of the notice of surrender.[5]
The juvenile court consolidated all of the procedural issues and took evidence on February 7, 2000. At the beginning of the hearing, the attorneys for A.E., A.S., and A.J.F. stipulated that they agreed in December that no one would file pleadings or set the matter for hearing until the paternity issue was settled by DNA evidence. In addition, the juvenile court heard testimony from various office personnel and attorneys at the suite of offices occupied by A.E.'s attorney, as well as Charles Trapani, the process server for the juvenile court who purportedly affected representative service on A.E.'s attorney's secretary. The juvenile court judge granted A.E.'s declinatory exception, finding that service was neither properly made on A.E.'s attorney nor her designated secretary as required by LA.CODE CIV. PROC. art. 1235.[6] She then also denied the peremptory exception of prescription. In conformity with LA. CHILD. CODE art. 1137(B), the juvenile court appointed an attorney to represent the interests of the minor child in this matter and set A.E.'s opposition for a hearing on the merits.
After conducting a hearing on February 14 and 15, 2000, the juvenile court issued extensive written reasons in which she granted A.E.'s opposition to the adoption and awarded custody of the minor child to him. The juvenile court found that A.E. established his parental rights by executing and publicly recording an authentic act of acknowledgment, by acknowledging his paternity in open court, and by showing through DNA testing that he was M.S.'s father. The juvenile court then found that A.E. proved that he had "manifested a substantial commitment to his parental responsibilities" as required in LA. CHILD. CODE art. 1138(A), (B). In reaching this conclusion, the juvenile court stated that A.E. provided food, clothing, and shelter to A.S. during the early and middle months of her pregnancy, that he purchased baby furniture and other necessary items in preparation for the birth, that he established a living area for the baby in his room, and that he maintained contact with A.S.'s grandmother about the progress of A.S.'s pregnancy. The juvenile court made a factual finding that A.S. "made [A.E.] aware that she feared for her safety with [F.H.] if [A.E.] came around her. [A.E.] believed this to be true, as he was well familiar with [F.H.]. Nevertheless, [A.E.] did what he could to establish his commitment to his parental responsibilities." The juvenile court further found that A.E. immediately sought legal advice *52 when he learned of the baby's birth and followed the advice to employ a Louisiana attorney.
In contrast to A.E.'s efforts, the juvenile court found that A.S. thwarted A.E.'s ability to establish his commitment to his parental responsibilities and fraudulently surrendered M.S. to the prospective adoptive parent. The juvenile court emphasized that A.S. failed to name A.E. in the act of surrender and did not inform her attorney or the attorney for the prospective adoptive parent that she had an intimate relationship with a man other than F.H. at the time of conception. She further stated that it caused her great concern that A.S. received a $4,000 payment on the same day that she executed the surrender of M.S. and that the money was used to purchase an automobile and to pay F.H.'s outstanding legal fines, clearly expenses that are not reimbursable under LA. CHILD. CODE art. 1223 et seq. or LA.REV. STAT. 14:286 (sale of minor children). Moreover, the juvenile court found that F.H. willingly participated in this fraud even though he knew that A.S. lived with A.E. during the time of conception and that she strongly suspected that F.H. participated in this fraud because of the monetary gain he received as a result of the adoptive parent's $4,000 payment at the time of surrender.[7]
In its analysis, the juvenile court further resolved conflicting testimony about A.E.'s commitment to support M.S. Although there was testimony that A.E. had not consistently supported two other children he fathered, the juvenile court resolved these differences in A.E.'s favor, finding countervailing evidence that he provided some monetary support, that he supplemented these amounts with the purchase of clothes and other necessities, and that he accepted his two children into his home on many occasions and supported them for extended periods of time.
The juvenile court next concluded that A.E. was willing and able to assume the legal and physical care of M.S. She found that A.E. proved that he could provide an adequate home for the child, and that his steady employment for more than a year showed that his monthly after-tax income of $1,200 was sufficient to provide for the child.
Finally, the juvenile court considered A.E.'s fitness as a parent of the child. In finding that A.E. would be a fit parent, the juvenile court found that A.E. had shown that he had a positive relationship with his two other children and that the mother of these children trusts him with their care. Further, the juvenile court found that although A.E. had belonged to a gang and exhibited gang-like tatoos on his body, the evidence preponderated that he was no longer an active gang member. Lastly, the juvenile court considered testimony of substance abuse on the part of A.E. and other family members in the household (particularly, his father) and dismissed them as uncorroborated.
After considering all of these elements, the juvenile court maintained A.E.'s opposition to the adoption on February 18, 2000, and granted him legal custody of M.S.[8] Although the juvenile court initially ordered the prospective adoptive parent to immediately transfer custody, it stayed its *53 order on February 22, 2000, pending appeal. On that same day, the prospective adoptive parent perfected an appeal.[9]
The appellate court, Fifth Circuit, heeding our policy to promptly take up matters involving child custody,[10] heard this adoption matter and expeditiously rendered an opinion on March 23, 2000, reversing the juvenile court. In its reversal of the juvenile court, the appellate court agreed with the juvenile court's finding that service on A.E. was improper, but found that his "action to annul [the] surrender" was prescribed under LA. CHILD. CODE art. 1148 because A.E. had actual knowledge of M.S.'s birth within days of the child's birth, and yet he brought his action to annul the surrender more than ninety days from the execution of the last act of surrender. Accordingly, it concluded that the juvenile court erred as a matter of law in failing to find that A.E.'s action to annul the surrender of M.S. was prescribed.
The appellate court next considered the issue of A.E.'s parental fitness and responsibility. Finding the juvenile court's factual findings manifestly erroneous in these regards, it further concluded that although A.E. proved through DNA testing that he was the child's father, he failed to prove that he was substantially committed to his parental responsibilities and to show that he was fit to raise the child. It found that the juvenile court manifestly erred in finding that A.E. consistently supported and visited with his other children. The appellate court further found that the evidence was significant that A.E. was an important member of a gang, that he had admitted that involvement to law officers, and that his two brothers, who live in his house, were also gang members. It also determined that it was significant that A.E. did not consistently provide financial support to the mother during the pregnancy nor sought to send her money after she relocated, even though he knew that her family could help him contact her. Finally, it found that the evidence of drug and/or alcohol use by both A.E. and his father raised questions of parental fitness.
Even though the appellate court did not condone the biological mother's lack of forthrightness, it nonetheless found that A.E. did not establish that he attempted to contact the mother during the pregnancy to seek custody on his own or even to see the child. Although it found that A.E. did purchase some baby items and prepare a bedroom for the child, it concluded that these slight commitments to parental responsibility did not rise to the level of substantial commitment required by LA. CHILD. CODE art. 1138. Accordingly, when it considered this evidence in light of the expert psychological evidence of Dr. Allison Steiers on the importance of familial bonding, it found that the fundamental rights of the biological father were not to prevail because of a lack of proof. Therefore, it concluded that the child's best interest was best served by granting permanent, sole custody of M.S. to the proposed adoptive parent.
We granted the writ application of A.E. to consider the correctness of the appellate court's resolution of the legal issues presented. In re: A.J.F., Applying for Private Adoption, 00-0948 (La.4/26/00), 760 So.2d 1163.

LAW AND ANALYSIS
A.E. contends that the appellate court erred when it found that his petition for habeas corpus and his opposition to the adoption were untimely. He argues that his actual notice of M.S.'s birth and surrender *54 for adoption was insufficient to meet the due process requirement in adoption proceedings. His position is correct.
From the outset, we regress a moment to recap the procedural posture of this case. It is important to note at this time that no petition for adoption has yet been presented to the juvenile court for consideration. A.J.F. maintains custody of M.S. by virtue of an order from the juvenile court dated October 15, 1999, which recognized her as M.S.'s legal custodian during the pending adoption proceedings.[11] The only filings are A.J.F.'s petition of filing of the surrendering documents with their supporting affidavits and A.E.'s petition for habeas corpus and opposition to the private adoption. In objection to those proceedings, the prospective adoptive parent raised a peremptory exception of prescription; A.E. contested his lack of notice of A.S.'s surrender for adoption. Thus, the threshold issue presented to the lower courts was the question of whether A.E.'s opposition to the private adoption came too late.
In addressing this crucial preliminary issue, both lower courts agreed that the service of process that was attempted was improper. Contrary to the dictates of LA. CHILD. CODE art. 1134, the notice of the filing of the mother's surrender on A.E., a non-resident, was not made by either registered or certified mail, return receipt requested. Next, even if service was intended to be made through A.E.'s attorney pursuant to her requests for notice under LA.CODE CIV. PROC. art. 1913 (notice of signing of judgment), 1914 (notice of rendition of interlocutory order), and 1572 (written request for notice of trial), the process server for the juvenile court failed to serve either the attorney of record or her secretary as provided in LA.CODE CIV. PROC. art. 1235.[12] We find that the lower courts were correct in this finding.
Nevertheless, the appellate court ruled that A.E.'s "action to annul [the] surrender" was prescribed under LA. CHILD. CODE art. 1148 because he had actual knowledge of his son's birth and failed to bring his action to annul within ninety days from the execution of A.S.'s act of surrender. Simply stated, the court of appeal found that actual notice was just as effective as legal notice for the purpose of tolling prescription. For the reasons which follow, we find the appellate court's reliance on LA. CHILD. CODE art. 1148 both misplaced and incorrect as a matter of law.
We further note that the appellate court mischaracterized A.E.'s pleading filed in the juvenile court. Instead of correctly referencing the action as an opposition to the private adoption, the appellate court referred to the pleading as an action to annul the surrender and analyzed it as such. Because LA. CHILD. CODE art. 1137 permits an alleged or adjudicated father to "oppose the adoption of his child by filing a clear and written declaration of intention to oppose the adoption," A.E. did not have to annul the surrender documents.[13] After having filed such an opposition, it was A.E.'s burden to establish his parental rights as outlined in LA. CHILD. CODE art. 1138. We will first address the question of notice and then attempt to clear up the confusion on the availability of the action to annul an act of surrender before we reach the issue of whether A.E. met his *55 burden of proof under LA. CHILD. CODE art. 1138.

Due Process of Law: Notice
Under the Fourteenth Amendment to the United States Constitution and LA. CONST. art. I, § 2, a person is protected against a deprivation of his life, liberty, or property without "due process of law." As recognized in Fields v. State, Through Dep't of Pub. Safety & Corrections, 98-0611 (La.7/8/98), 714 So.2d 1244, 1250, and Progressive Sec. Ins. Co. v. Foster, 97-2985 (La.4/23/98), 711 So.2d 675, 688, the guarantee of due process in the Louisiana Constitution does not vary semantically from the Due Process Clause of the Fourteenth Amendment. Consequently, federal jurisprudence is relevant in the determination of the nature and extent of LA. CONST. art. I, § 2.
The jurisprudence is well-settled as to the meaning of procedural due process. As recognized in In re Adoption of B.G.S., 556 So.2d 545, 549 (La.1990), persons whose rights may be affected by state action are entitled to be heard, and, in order that they may enjoy that right, they must first be notified. Equally fundamental is that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner. Id. (collecting cases). For due process to apply, the private interest affected by state action must be constitutionally cognizable. Fields, 714 So.2d at 1250. We addressed this private interest of a biological father in In re Adoption of B.G.S., 556 So.2d 545. There we stated:
The interest of a parent in having a relationship with his children is manifestly a liberty interest protected by the Fourteenth Amendment's due process guarantee. The United States Supreme Court has declared it "plain beyond the need for multiple citation" that a biological parent's right to "the companionship, care, custody, and management" of his children is a liberty interest far more important than any property right. Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); Lassiter v. Department of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640 (1981). Accordingly, the interest of an unwed father in the children he has sired and raised is entitled to protection under the Due Process Clause. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
In re Adoption of B.G.S., 556 So.2d at 549-50; see also Troxel v. Granville, 530 U.S. ___, ___ _ ___, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."); State of Louisiana in the Interest of J.A., 99-2905, p. 7-8 (La.1/12/00), 752 So.2d 806. ("The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law ... and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship.").
Partly in response to this jurisprudence and partly because of the dire need to synthesize the myriad statutes which attempted to regulate the lives of children in Louisiana, the Legislature adopted the Children's Code as 1991 LA. ACTS 235. Teanna West Neskora, Comment: The Constitutional Rights of Putative Fathers Recognized in Louisiana's New Children's Code, 52 LA. L.REV. 1009 (1992).[14] Of utmost interest to us are the specific notice provisions provided for putative fathers, as well as the time limitations established for opposition to a proposed private adoption *56 and for asserting an action to annul an adoption proceeding because of fraud or duress.
The Children's Code recognizes that when a mother surrenders her parental rights, it is required that an alleged or an adjudicated father be given notice of the filing of the surrender. LA. CHILD. CODE arts. 1132-1136. Correlative to that right, is the provision of LA. CHILD. CODE art. 1138 which provides the alleged or adjudicated father with a hearing in which he is given an opportunity to prove his commitment to parental responsibilities and his fitness as a parent. See In the Matter of R.E., 94-2657 (La.11/9/94), 645 So.2d 205, 208, (citing Lehr v. Robertson, 463 U.S. 248, 250, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)).
To this end, the Children's Code identifies three basic situations in which the mother of an illegitimate child has executed a surrender document. In the first instance, the mother has identified the child's alleged or adjudicated father in the surrender document. Pursuant to LA. CHILD. CODE art. 1132, the clerk of court shall issue a notice which allows him fifteen days after receipt of the notice to file a written objection to oppose the proposed adoption. Whether or not the alleged or adjudicated father is a resident or nonresident of this state, "service shall be made by either registered or certified mail, return receipt requested, postage prepaid and properly addressed to his last known address." LA. CHILD. CODE arts. 1133-1134. This notice requirement is waived if the father named in the surrender document also signs a surrender document, has had his parental rights terminated by judgment, has consented in open court to the surrender, or has executed a release of claims. LA. CHILD. CODE art. 1132(A)(1-4). In the second instance, the mother has identified the child's alleged or adjudicated father in the surrender document, but his whereabouts are not known. As provided in LA. CHILD. CODE art. 1136, the juvenile court must appoint a curator whose duty it is to "begin a diligent effort to locate the alleged or adjudicated father within seven days ... from the date of his appointment." After thirty days following the appointment of the curator have elapsed, the court, after finding that the curator made a diligent effort to locate the father, shall terminate the alleged or adjudicated father's parental rights. In the third instance, the mother has indicated in the surrender document that the father of the child is unknown. In such scenario, LA. CHILD. CODE art. 1135 allows the juvenile court to terminate the father's parental rights "upon finding that a diligent effort has been made to identify the father."
In the present case, although the facts suggested that this case fell into the first instance outlined and notice was not required because F.H. also surrendered M.S. for adoption, LA. CHILD. CODE art. 1132(B)(2), it quickly evolved into a situation where none of the three basic scenarios provided in the Children's Code applied. Rather, the facts presented the juvenile court with a case in which the mother either misidentified the father or fraudulently attributed paternity to someone other than the actual biological father. Commenting on just such a scenario, the 2000 Authors' Notes to LA. CHILD. CODE art. 1122 states:
In counseling a mother who intends to surrender a child for adoption, caseworkers and counsel must emphasize the importance of her candor and accuracy in giving information about her marital status and in identifying the father or potential fathers of her child. In view of the recognition of the constitutional rights of alleged fathers, the failure to identify a potential father or the fraudulent misattribution of paternity to someone other than the actual biological father can cause an adoption to be nullified (Arts. 1262-1263) and cause enduring trauma for all parties.... In addition, a surrender is an authentic act. C.C. Art. 1833. A mother who falsely claims a lack of knowledge of the father's identity or who *57 willfully misidentifies the father risks prosecution for false swearing. R.S. 14:125.
Professional counselors should err on the side of caution in investigating paternity and in advising mothers about paternity averments in the surrender. If there is a possibility that more than one man could be the child's father, each should be contacted before the mother's surrender is executed. If any refuses to execute a surrender, to execute a relinquishment of claims, to consent in open court, or to submit to paternity testing which might negate his interest, then he should be identified in the mother's surrender and served with notice of her surrender. It is better to have an adoption fail early due to a successful opposition by an alleged father (Art. 1138), than to fail later, disrupting the long-settled expectations of all parties and the stability of the child.
LUCY S. MCGOUGH & KERRY TRICHE, LOUISIANA CHILDREN'S CODE HANDBOOK 500-01 (1999).
Unfortunately, the wise words of the commentators were not heeded, and the juvenile court was invoked to settle an emotional legal dispute caused by the misidentification of a natural father who has cognizable constitutional rights to parenthood.
As we stated earlier, the lower courts properly found that the attempted service of notice was not properly made on A.E. We further find that A.E.'s actual knowledge of M.S.'s birth and the surrender for adoption by A.S. and F.H. does not substitute for the detailed notice requirement laid out in LA. CHILD. CODE art. 1132. Not only is the alleged or adjudicated father required to receive notice of the birth and the surrender, he is also required to be notified that he loses his right to oppose the adoption of his child if he fails to file a written objection with the court within fifteen days after receipt of notice. LA. CHILD. CODE art. 1132(D). In addition to this vital notification, the alleged or adjudicated father is required to receive essential information about the specific criteria with which a court will evaluate his opposition to the adoption and his assertion of parental rights to the child, namely acknowledge that he is the father of the child; demonstrate his fitness as a parent together with his willingness and ability to assume legal and physical care of the child; demonstrate that he has made a substantial commitment to his parental responsibility by providing or attempting to provide for the mother during pregnancy or after birth and consistently visiting or attempting to visit the child after birth. Finally, the alleged or adjudicated father is required to be provided with information of the consequences of his failure to act timely, i.e., the termination of any and all parental rights he may have.[15] Even though A.E. may have known about the birth of M.S. and that A.S. and F.H. were surrendering the child for adoption, he did not have notice of the various integral components detailed in LA. CHILD. CODE art. 1132(D). In essence, this legislative enactment of notice provisions implements the theoretical basis for parenthood espoused in Lehr which only comes into fruition if the alleged or adjudicated father has an opportunity to assert his rights:
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.
Lehr, 463 U.S. at 261-62, 103 S.Ct. 2985. Accordingly, we find that the appellate court erred as a matter of law in finding *58 that A.E.'s actual knowledge obviated the need for legal notice. Therefore, A.E.'s petition of January 28, 2000, was timely.
We next consider the reasoning that the appellate court used as underpinning for its resolution of the notice issue: the need to insist that a father assert his parental rights within a specified time period. For the appellate court, such justification was found in the annulment articles of the Children's Code relative to the nullification of acts of surrender for fraud or duress.
LA. CHILD. CODE art. 1147 provides that "[n]o act of surrender shall be subject to annulment except upon proof of duress or fraud, notwithstanding any provision of law to the contrary." With regard to the finality of acts of surrender, LA. CHILD. CODE art. 1148 provides that "[n]o action to annul a surrender shall be brought for any reason after ninety days from its execution or after a decree of adoption has been entered, whichever is earlier."
Contrary to the holding of the appellate court, the action for annulment of a surrender is only available to parents who allege that despite their execution of an act of surrender, "he or she did not voluntarily or knowingly consent to the adoption of the child" because of fraud or duress. As we pointed out in In re J.M.P., 528 So.2d 1002 (La.1988):
[T]he executed act of surrender, although highly regulated and specialized, is in essence a contract, namely an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. Civ.Code art. 1906. Accordingly, as in other agreements, the consent necessary to the surrender of a child for private adoption may be vitiated by ... fraud or duress. (footnote omitted) (citations omitted).
Id. at 1008[16]; see also 2000 Authors' Notes, MCGOUGH & TRICHE, supra at 535.[17] Applying this reasoning to the present case, it is clear that because A.E. was not an executing party to the acts of surrender, he could not seek their dissolution due to fraud or duress which would have vitiated the consent of either A.S. or F.H. Accordingly, we find that LA. CHILD. CODE arts. 1147 and 1148 were not applicable to A.E.
As additional justification for its application of LA. CHILD. CODE arts. 1147 and 1148, the appellate court rested its decision on the recognized need for finality of adoption proceedings. It reasoned that if LA. CHILD. CODE arts. 1147 and 1148 were not utilized, "[t]here would be no safeguards to prevent a biological father from successfully annulling an adoption ten or 15 years after it took place." In re A.J.F., Applying for Adoption, 00-CA-262 (La.App. 5 Cir. 3/23/00), 756 So.2d 1187, 1191. Although we wholeheartedly agree with the need for the finality of judgments in adoption matters within a relatively limited period of time, we find that the appellate court overlooks two areas of the Children's Code which provide for such finality. These areas are the codal provisions relative to the annulment of final decrees of adoption, LA. CHILD. CODE arts. 1262 and 1263, and those providing for the pre-adoption procedure for recognition of the termination of parental rights, LA. CHILD. CODE art. 1142.
Although LA. CHILD. CODE art. 1262 establishes that fraud or duress are the only *59 grounds for an action to annul a final decree of adoption, LA. CHILD. CODE art. 1263[18] provides:
A. No action to annul a final decree of adoption based upon a claim of fraud or duress perpetrated by the adoptive parent or by his agent or representative with the parent's knowledge shall be brought after a lapse of six months from the date of discovery of the fraud or duress.
B. An action to annul a final decree of adoption based upon a claim of fraud or duress perpetrated by anyone else must be brought within six months from discovery of the fraud or duress and in no event later than four years from the date of the signing of the final decree or mailing of the judgment when required.
Thus, the finality of adoptions is provided for by the provisions of LA. CHILD. CODE art. 1263 which specify the time period in which a party may seek to annul a decree of adoption.
LA. CHILD. CODE art. 1142 is another element within the scheme of the Children's Code adopted to minimize, if not eliminate, successful attacks to the surrender of parental rights. Once the acts of surrender are filed with the juvenile court, the court may authorize counsel to seek an order terminating parental rights pursuant to LA. CHILD. CODE art. 1142(A). 2000 Authors' Notes, McGOUGH & TRICHE, supra at 514. Not only does this article further allay the fears raised in justification of the appellate court decision as regards the timeliness of A.E.'s opposition, it further buttresses our determination that his action to oppose the adoption was timely.
LA. CHILD. CODE art. 1142 provides:
A. If no opposition is timely received by the court, the court shall, upon motion, render an order declaring the rights of the parents terminated.
B. The motion shall be accompanied by a certified copy of the child's birth certificate, a certificate from the putative father registry indicating whether any act of acknowledgment by authentic act has been recorded, and a certificate from the clerk of court in and for the parish in which the child was born indicating whether any acknowledgment by authentic act, legitimation by authentic act, or judgment of filiation has been recorded relative to this child.
C. If the clerk reports that a legitimation by authentic act has been duly recorded by a father, the court shall deny the motion unless the father's parental rights have been terminated in accordance with Title X or the father has executed a surrender in accordance with this Title or has given his consent to the adoption in accordance with Article 1195.
D. If any of these certificates identify an alleged or adjudicated father who has not previously been served with notice of the mother's act of surrender, the alleged or adjudicated father shall be served with a copy of the motion to terminate his parental rights and given an opportunity to be heard in accordance with Articles 1132 through 1141 unless any of the following occur:
(1) The alleged or adjudicated father's parental rights have been terminated by a judgment in accordance with Title X.
(2) The alleged or adjudicated father has executed an act of surrender in accordance with this Title.
(3) The alleged or adjudicated father has consented to the child's adoption in accordance with Article 1195.
(4) The alleged or adjudicated father has executed a release of claims in accordance with Article 1196. (emphasis added).
When we read the various provisions of the Children's Code, we realize that it has built in numerous safety nets to identify alleged or adjudicated fathers who were *60 not attributed with paternity in the acts of surrender and who surface at a later date. LA. CHILD. CODE art. 1142 not only recognizes the need to terminate parental rights as a necessary precursor to adoption, it provides a valuable safety net for the identification of alleged or adjudicated fathers who may have learned of their putative fatherhood and wish to take steps to recognize their parental rights. Even though the biological mother may have either misidentified the father or have fraudulently attributed paternity to someone other than the actual biological father, LA. CHILD. CODE art. 1142 provides a self-operating mechanism which triggers a search for fathers such as A.E. who have filed an acknowledgment of paternity after learning of the birth of their child.
Applying LA. CHILD. CODE art. 1142 to the facts of the case sub judice and having found that A.E. did not receive notice of A.S. and F.H.'s surrender, we find that A.E.'s recordation of his acknowledgment of paternity and filing in the Putative Father's Registry on November 15, 1999, and November 16, 1999, respectively, with nothing more, would have triggered the application of LA. CHILD. CODE art. 1142(D). If the proposed adoptive parent had motioned the juvenile court to render an order declaring the rights of the F.H. and A.S. terminated, the provisions of LA. CHILD. CODE art. 1142(D) would have "given [A.E.] an opportunity to be heard in accordance with Articles 1132 through 1141" because a search conducted pursuant to LA. CHILD. CODE art. 1142(B) would have produced his recordation of M.S.'s paternity with the clerk of court as well as in the Putative Father's Registry and would have recognized the panoply of notice and hearing rights provided in LA. CHILD. CODE arts. 1132-1141. As such, A.E. would have been granted an opportunity to acknowledge that he was M.S.'s father in open court, express his opposition to the adoption, and demonstrate that he was a fit parent "willing and able to assume the legal and physical care of [his] child." LA. CHILD. CODE art. 1132(D). Having SO found, we cannot say that A.E. would have fewer rights because he filed his petition for habeas corpus and opposition to private adoption on January 28, 2000.[19]

Opposition Hearing: Father's Parental Rights and Commitment
We next proceed to the question of whether the juvenile court was manifestly *61 erroneous in its assessment of the evidence presented at the hearing of A.E.'s opposition to the adoption. At that time, the appellate court considered the juvenile court's assessment of the elements of LA. CHILD. CODE art. 1138, namely A.E.'s commitment to parental responsibilities and fitness to assume legal and physical care of M.S.
LA. CHILD. CODE art. 1138 provides, in pertinent part:
A. At the hearing of the opposition, the alleged or adjudicated father must establish his parental rights by acknowledging that he is the father of the child and by proving that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent of his child.
B. Proof of the father's substantial commitment to his parental responsibilities requires a showing, in accordance with his means and knowledge of the mother's pregnancy or the child's birth, that he either:
(1) Provided financial support, including but not limited to the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child.
(2) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing and able to assume legal and physical care of the child.
C. The child and the legal custodian may offer rebuttal evidence limited to the issues enumerated in Paragraphs A and B of this Article.
In its assessment of A.E.'s burden under LA. CHILD CODE art. 1138, the appellate court found manifest error on the part of the juvenile court. It is well-settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. "Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court." Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); In re: M.M. de St.G., wife of and PBS, Applying for Private Adoption of K.N.K., 97-655 (La.App. 5 Cir. 11/25/97), 705 So.2d 220. Where the fact finder is presented with two permissible views of the evidence, the fact finder's choice between them is not clearly wrong. Rosell, 549 So.2d at 844.
In the case sub judice, the appellate court appropriately noted that "[t]he criteria of parental fitness and substantial commitment to parental responsibilities... are vigorously contested and the facts surrounding each are disputed in their entirety." In re A.J.F., Applying for Adoption, 756 So.2d at 1192. Nevertheless, it chose to reevaluate testimony applicable to A.E.'s threefold burden under LA. CHILD. CODE art. 1137:(1) acknowledgment of paternity in open court; (2) proof of his efforts to seize his parental opportunity interest; and (3) proof of his present fitness for custody. See In re Adoption of B.G.S., 556 So.2d at 545 (La.1990); In the Matter of R.E., 645 So.2d at 205 (La.11/9/94). As shown in the juvenile court's well considered reasons for judgment, it thoroughly considered the questions of A.E.'s gang involvement and those of his brothers, the level of his support and care for his other children, A.S.'s fraudulent actions and surreptitious maneuvering from state-to-state, safety considerations which may have kept A.E. from contacting *62 A.S. while she stayed with F.H., and the conflicting testimony of the alleged drug/alcohol use of A.E. and his father. After reviewing those reasons in light of A.E.'s burden of proof under LA. CHILD. CODE art. 1138, it is clear to us that the appellate court disagreed with many of the conclusions and inferences that the juvenile court drew from the facts and substituted its opinion for that of the juvenile court.[20] In manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court who is in the unique position to see and hear the witnesses as they testify. The trier of fact is not disadvantaged by the review of a cold record and is in a superior position to observe the nuances of demeanor evidence not revealed in a record. Adkins v. Huckabay, 99-3605 (La.2/25/00), 755 So.2d 206. Accordingly, we reinstate the judgment of the juvenile court.[21]

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed and set aside. The judgment of the juvenile court is reinstated. This matter is remanded to the juvenile court for entry of a judgment dissolving the mother's act of surrender and for purposes of giving her notice so that she can make a knowing decision regarding any exercise of parental rights.[22] It is further ordered that the juvenile court may consider the allocation of all or part of the medical expenses incurred for the mother or on her behalf by the prospective adoptive mother in connection with the birth of the child.[23]
REVERSED AND REMANDED.
VICTORY, J., additionally concurs with reasons.
VICTORY, J., concurring.
I agree with the majority's opinion in this case. However, I write separately to express my concerns regarding the constitutionality of article 1138 of the Louisiana Children's Code, more particularly, the equal protection issue it raises by demanding proof of fitness by an unwed father and not from an unwed mother.
Article 1138 requires the alleged or adjudicated father to establish his parental rights by proving that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent. Yet, nowhere in the Louisiana Children's Code is the unwed mother required to prove that she is a fit parent to prevent the adoption of her child if the father chooses to give up his child for adoption. She only has to withhold her consent. This disparity is unfair and appears on its face to violate the equal protection clause of the United States Constitution.
The United States Supreme Court has not decided whether such a scheme violates the equal protection clause when applied to a newborn child, but has indicated that it does. In Caban v. Mohammed, 441 *63 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), a New York statute gave unwed mothers authority to block adoptions by withholding consent, but did not give the unwed father similar control. The unwed father could only prevent the termination of his rights by showing that the best interests of the child would not permit the child's adoption by the petitioning couple. In holding the statute unconstitutional, the Supreme Court stated that the statute Our treated unwed parents differently according to their gender. It noted that the distinction between unwed mothers and unwed fathers was substantially related to the State's interest in promoting the adoption of illegitimate children. However, the distinction must be reasonably structured to achieve those ends. Although the Court, in dicta, stated that "[i]n those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding him the privilege of vetoing the adoption of that child," in the context of the case, the Court was referring to the adoption of older children[1], not the adoption of newborn children. In the case of older children, the father has had an opportunity to participate in the rearing of his child.
After Caban, the Supreme Court held that when one parent has established a relationship with a child and the other parent has either abandoned the child or has never established a relationship, the equal protection clause does not prevent a state from giving the two parents different legal rights. Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). However, this case also involved a father that had had an opportunity to develop a relationship with his older child, not a newborn.[2]
Therefore, in situations involving the adoption of older children, the Supreme Court has established two teachings regarding statutes giving unwed fathers different legal rights from unwed mothers. Caban teaches that if both unwed parents have established a relationship with the child, they have to be treated the same. Lehr teaches that if one parent has established a relationship with the child and the other has not, they do not have to be treated the same.
Our statute is analogous to the statute at issue in Caban. Pursuant to article 1138, an unwed father, even one having a relationship with that child since birth, must prove not only that he has manifested a substantial commitment to his parental responsibilities but also that he is a fit parent to prevent the adoption of his child, whereas, the unwed mother in Louisiana only has to withhold her consent and is not required to prove her fitness. Our Children's Code does not even provide for a hearing on the mother's commitment to the child or her fitness.
In my view, an unwed father who desires to raise his child should be presumed to be a fit parent to raise his child, as an unwed mother is, and should not have to fight a proposed adoptive parent for the right to raise his biological child merely because the mother chooses to give up her parental rights.
The instant case provides a good example of the disparity. If the unwed mother had chosen to keep the child and the father had chosen to give up his parental rights, there would be no hearing on her substantial commitment to raise her child and whether or not she was a fit parent. She simply would keep the child and raise it. But because of article 1138, the father who wanted to raise his child when the mother chooses to give up her parental rights has been forced to come into court to not only to prove his commitment to parental responsibilities, but also his fitness *64 as a parent in a fight against the proposed adoptive parent.
NOTES
[*] Calogero, C.J., not on panel; Rule IV, Part 2, § 3
[1] The initials of the parties will be used throughout this opinion to protect and maintain the privacy of the minor child involved in this proceeding.
[2] LA.CODE CIV. PROC. art. 1235 provides, in pertinent part:

(B) Service on an attorney, as representative of a client, is proper when the attorney's secretary is served in the attorney's office.
(C) For the purposes of the Article, "secretary" shall be defined as the person assigned to a particular attorney and who is charged with the performance of that part of the attorney's business concerned with the keeping of records, the sending and receiving of correspondence, and the preparation and monitoring of the attorney's appointments calendar.
[3] Although the documents submitted into evidence show that ReliaGene concluded on January 5, 2000, that A.E. was the father, the record does not reflect the date that the parties received such information. Correspondence dated January 26, 2000, from A.E.'s attorney to Andrea's shows that the official test results had not been disseminated because A.J.F.'s attorney had not yet paid her portion of the testing fee.
[4] Because of our resolution of the notice issue, we do not reach the question of whether the parties could effectively suspend the time limitations established in the Children's Code.
[5] We observe that the Code of Civil Procedure does not recognize a declinatory exception of improper service. The declinatory exception is more correctly denominated as insufficiency of service of process. LA.CODE CIV. PROC. art. 925(2). It is also well established that the Code of Civil Procedure does not recognize the filing of exceptions to exceptions. Because the service of the notice of surrender began the adoption proceeding in the present case, we find that it is akin to a petition. Accordingly, we will treat the declinatory exception of insufficiency of service of process as being applicable to the purported notice filing, not Andrea's filing of the peremptory exception of prescription.
[6] Even though the juvenile court granted the declinatory exception, the record does not show that proper service of the notice was ever made. As noted in FRANK L. MARAIST & HARRY T. LEMMON, 1 LOUISIANA CIVIL LAW TREATISE: CIVIL PROCEDURE, § 6.5, at 108 (1999) ("Such objections generally can be cured by serving again on the proper person or in the proper manner.")
[7] A.J.F., the prospective adoptive mother, did not testify at the hearing. In a motion for a new trial, which the juvenile court denied, she urged that she had no notice from A.E.'s pleadings that the court would entertain evidence of the amount of living expenses paid in the adoption and the surrendering parties' knowledge of the child's paternity at the time the acts of surrender were completed.
[8] Even though the juvenile court found in its written reasons for judgment that both A.S. and F.H. fraudulently executed the acts of surrender, the judgment neither mentions such finding nor annuls those authentic acts because of fraud.
[9] Although the record shows that attorneys represented the biological mother and the minor child, they did not appeal the juvenile court decision. We note that because the mother's surrender is irrevocable upon execution, LA. CHILD. CODE arts. 1123, 1130, the mother is actually not a party to the opposition hearing. If, however, the father's opposition is successful, the mother's act of surrender is dissolved by operation of law and she is entitled to notice of the dissolution. LA. CHILD. CODE art. 1139.
[10] See e.g., In re J.M.P., 528 So.2d 1002 (La. 1988); LA. CHILD. CODE art. 1143; LA. S.CT. R. XXXII, XXXIV.
[11] This custody award was based upon a preplacement home study and the issuance of a certification for adoption to the prospective adoptive parent. See LA. CHILD. CODE arts. 1172-1174.
[12] In referencing these articles from the Code of Civil Procedure, we in no way intend to imply that such request can modify the specific provisions for notice under the Children's Code. Because the purported service on the attorney was defective, we need not reach this issue.
[13] A careful review of the juvenile court proceedings shows that the judgment maintained A.E.'s opposition to the private adoption and ordered that he be granted the legal custody of the minor child, M.S. The judgment did not annul the acts of surrender and could not annul the adoption because none had yet been petitioned.
[14] Of particular interest in this comment is the hypothetical scenario that the author presents as an area of concern unanswered in the Children's Code. The facts presented in that query closely resemble many of the facts presented herein. Neskora, supra at 1038-42.
[15] In actuality, these specifics provide the alleged or adjudicated father with a thumbnail sketch of his burden of proof as established in LA. CHILD CODE art. 1138.
[16] Although our 1979 decision in In re J.M.P. provided that an act of surrender could be set aside because consent of the parties was vitiated by error, fraud or duress, we note that LA. CHILD. CODE art. 1147 limits annulment only to "proof of duress or fraud."
[17] In conformity with that jurisprudence and the provisions of LA. CHILD. CODE art. 1147, the surrender documents executed by F.H. and A.S. each specifically provided:

Affiant declares that he [she] has been informed and understands that his [her] rights as the parent of this expected child are permanently and irrevocably terminated by execution of this Act of Surrender. However, he [she] understands that this Act of Surrender may be declared null due to fraud or duress....
[18] Unlike LA. CHILD. CODE arts. 1147 and 1148 applicable to the annulment of acts of surrender, LA. CHILD. CODE art. 1263 does not limit the action for annulment of the final decree of adoption to the parties who may have executed acts of surrender.
[19] Moreover, even if A.E. received notice as provided in the Children's Code, the juvenile court could arguably have proceeded to address the issue of nullity provided for adoption decrees in LA. CHILD. CODE arts. 1162 and 1163 because of the fraudulent surrender documents. Although LA. CHILD. CODE arts. 1162 and 1163 speak of annulling an adoption decree, the question of nullity might have been addressed under the general authority of the juvenile court. We state this for three reasons. First, under the specific provisions of LA. CHILD. CODE art. 1263, the time limitations for such action would have begun from the time of A.E.'s "discovery of the fraud." As found by the juvenile court, A.S. and F.H. fraudulently executed the surrender documents, and A.E. became aware of that fraud through communication from A.S.'s grandmother. Thus, A.E.'s knowledge of the events in November of 1999 could have started the running of this preemptive time and may have run before a final decree of adoption would have been obtained. Second, it is clear that the acts of surrender were necessary antecedents for the ultimate procurement of an adoption decree and their filing indeed initiated the adoption process. Thus, if they were tainted by fraud, that taint would have affected the final decree of adoption. Third, in the spirit of finality which permeates the adoption provisions of the Children's Code, it would have been appropriate to resolve as soon as possible any uncertainty for the benefit of the child and the prospective adoptive parent.

For cases involving fraud or the misattribution of paternity see for examples, Thomson v. Cavanaugh, 97-35 (La.App. 3 Cir. 3/3/97), 688 So.2d 1259, writ denied, 688 So.2d 528 (La.2/21/97); In re B.G.C., 496 N.W.2d 239 (Iowa 1992); In re Petition of Kirchner, 164 Ill.2d 468, 208 Ill.Dec. 268, 649 N.E.2d 324, cert. denied, 515 U.S. 1152, 115 S.Ct. 2599, 132 L.Ed.2d 846 (1995); In re Adoption of Baby Girl S., 141 Misc.2d 905, 535 N.Y.S.2d 676 (Surrogate Court), affirmed without opinion, 150 A.D.2d 993, 543 N.Y.S.2d 602 (1989); Riggs v. Riggs, 612 S.W.2d 461 (Tenn.App. 1980), cert. denied, 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981).
[20] The only factual difference we find in the opinions of the lower courts is the number of children that A.E. may have fathered. Whereas the juvenile court referred to two children, the appellate court made note of three. Our review of the record shows mention that A.E. may have had another child. The facts surrounding the birth mother, the child's birth, and whereabouts are sketchy at best.
[21] Having found no manifest error in the juvenile court decision, we need not reach the best interest test that the appellate court referred to at the conclusion of its opinion.
[22] LA. CHILD. CODE art. 1139 provides that if the opposition to adoption is maintained, the act of surrender is dissolved and "[t]he order shall be served on the surrendering parent in the manner for service of process provided in civil proceedings."
[23] LA. CHILD. CODE art. 1138(E) provides, in pertinent part that "[t]he court may also order the alleged or adjudicated father to reimburse the department, or the licensed private adoption agency, or other agency, or whoever has assumed liability for such costs, all or part of the medical expenses incurred for the mother and the child in connection with the birth of the child."
[1] The children in Caban were 7 and 5 at the time the petition for adoption was filed by their stepfather. The unwed father had been involved in their lives since their birth.
[2] The child at issue in Lehr was 2 years old at the time of the adoption.