MOORE, J.
The father, L.P., appeals a judgment of disposition finding that his daughter, K.P., is a child in need of care, continuing her custody with the Department of Sbcial Services (“DSS”), and subjecting L.P. to restricted and supervised visitation. We affirm.

Factual Background

On the evening of Sunday, November 28, 2003, DSS received a report from the emergency room of Willis-Knighton Pier-remont that 6/6-month-old K.P. had sustained a spiral fracture in the middle of her right femur. The child’s mother, K.M., told hospital personnel that K.P. had rolled . off a mattress and box springs onto the floor. However, the emergency room physician, Dr. Brandhurst, and the orthopedist on staff, Dr. Bicknell, both thought this was a serious injury, that could not happen accidentally. At the adjudication hearing, they .testified that an adult would have to grab the child’s thigh, pull and twist forcefully to break the bone this way.
When Ms. Hamilton, the DSS investigator; got to the hospital, the parents gave conflicting and changing stories. The father, L.P., said he did not live with the mother, had 'not seen K.P. in two weeks, and had no idea how the injury occurred. The mother, K.M., said that she, the baby and. the father had spent the afternoon together Christmas shopping at Pierre Bossier Mall, then came to L.P.’s apartment on Dee Street in east Shreveport, where they ate and watched a video, and finally she took the baby to her apartment on Dudley Drive in the Normandy Village area of Shreveport. She said the child was fine all afternoon and early evening, but while K.M. was in ^another room the child fell off the mattress and box springs and started crying. K.M. then noticed the child’s leg was swollen, so she took her to the hospital.
Ms. Hamilton then re-interviéwed the father. This time, he admitted he had indeed been with K.M. and the child that day. He also admitted he had been investigated by DSS for child abuse, arising from an incident in which he still insisted he was only trying to give K.P. some medicine when he bruised her face. He did not admit, but Ms. Hamilton soon learned, that just two months earlier a juvenile court hearing officer had issued a protective order upon finding that L.P. shook and bruised the child. L.P. violated this order by being with K.P. and K.M. on November 23.
*1192 The next day, Ms. Hamilton re-interviewed the mother, K.M., in the presence of a police detective. This time she said the baby had fallen off the mattress at the father’s apartment, and when she picked her up, she heard a “pop” and the child started screaming. She added that because the baby would not stop crying, L.P. went to pick her up. K.M. did not see what L.P. did, but when he was with the child, K.M. heard a “thumping” or “popping” noise. She later decided that these sounds were actually from the loud video they were watching, “Final Destination 2.” Detective Lamont then placed K.M. under arrest for cruelty to a juvenile. L.P. was not arrested.
DSS filed an affidavit in support of an instanter order that day, November 24. An emergency instanter order issued, placing K.P. in the legal custody of DSS, and in the physical custody of the child’s maternal grandparents in Thibodaux, Louisiana.
Is At the adjudication hearing on January 9, 2004, the witnesses testified as outlined above, both parents denying that they had hurt K.P. The mother testified that she changed her story to Ms. Hamilton and accused L.P. of thumping or popping the child only because she (K.M.) wanted to avoid being arrested for child abuse. She claimed that those accusations were false. The father, an E4 Senior Airman at Barksdale, admitted that he had previously bruised K.P., resulting in a protective order; DSS filed a transcript of the protective order hearing into evidence. The father also conceded that his USAF personnel file contained minor disciplinary matters and his superiors had required him to undergo anger management.
In addition, both mother and father related that while at Toys-R-Us, they put K.P. in an ExerSaucer; her foot got caught in the bottom, and they had to tug at her to get her out. Despite this new theory of KJP.’s injury, and their continued denial of any wrongdoing, the juvenile court adjudicated K.P. in need of care and continued her in DSS custody.
The disposition hearing was held on February 19, 23 and 26, 2004. A DSS social worker, Phyllis Jones, testified that in January K.M. admitted that she had moved back in with L.P. “in mid-November,” and thus both she and L.P. had lied about living apart when K.P. broke her leg. Ms. Jones and another social worker, Shauna Gilbert, testified that DSS had set four goals to reunify mother and child. They confirmed that the mother was attending sessions and the father was cooperating, but that he planned to leave Louisiana and did not intend to marry K.M. The juvenile court rendered a judgment of disposition finding K.P. still in need of care, continuing 14custody with DSS (placement with her maternal grandparents), and maintaining supervised sight and sound visitation at the discretion of DSS and the custodians.
From this judgment of disposition, L.P. has appealed, advancing two assignments of error.[1]

Discussion

By his first assignment, L.P. contends DSS did not prove by a preponderance of the evidence that he was involved in breaking K.P.’s leg, or even knew about it. In support, he paints the following factual scenario:
It is undisputed that L.P. was not around the child when the injury oc *1193 curred. Prior to Sunday afternoon, the father saw the child on Tuesday when he briefly visited the child at the daycare. Additionally, on Tuesday the minor child went to the doctor’s office for a checkup. If the injury existed prior to Tuesday, the doctor would have discovered the injury. Not only did the State fail to put on any evidence to dispute this testimony, but the mother admitted in court that the father did not break the child’s leg.
DSS responds that this argument reflects only one version of L.P.’s “multiple stories as to the events surrounding the apparent time of the injury.” DSS also cites the finding of the hearing officer who granted the protective order against L.P. on September 25, 2003, that he had an “attitude problem” and needed anger management. DSS concludes that with the highly conflicting testimony and L.P.’s record of abusing his daughter, the juvenile court was perfectly entitled to find K.P. in need of care.
 An appellate court will not set aside the factual findings of a juvenile | Rcourt in the absence of manifest error or unless those findings are plainly wrong. State in Int. of JB, 35,032 (La.App. 2 Cir. 5/9/01), 794 So.2d 899, and citations therein. When there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact are not disturbed on review. In re AJF, 2000-0948 (La.6/30/00), 764 So.2d 47. When the fact finder is presented with two permissible views of the evidence, his choice between them is not clearly wrong. State ex rel. GJL, 2000-3278 (La.6/29/01), 791 So.2d 80.
The juvenile court heard disparate and evolving accounts of KP.’s injury from both parents. Both denied intentionally harming the child, but their protestations of innocence are refuted by the expert medical evidence that such a fracture could only be intentional. The court theorized that L.P. and K.M. “were in a heated argument, tussling over the child, not meaning to hurt the child, and * * * were both involved in this child’s injury.” We perceive no manifest error in this assessment.
Notably, L.P. conceded that he had previously bruised the child’s face, and that his superiors at Barksdale had prescribed anger management; such admissions could easily persuade the juvenile court that L.P. was capable of perpetrating this abuse upon K.P.. La. Ch. C. art. 606 A(l). Even though at trial he denied breaking the .child’s leg, he admitted lying to the investigator, Ms. Hamilton, on several occasions. Most glaringly, L.P. urges in brief, “it is undisputed that L.P. was not around the child when the injury occurred.” This claim was refuted not only by K.M. but by L.P. himself on direct examination. , ,
l fiOn this record, the court was entitled to discredit L.P.’s denial of involvehient and find that he either abused K.P. of aided or tolerated the acts of abuse perpetrated by others. We perceive no manifest error.
By his second • assignment, L.P. urges the court should have given him physical custody of the child, subject to DSS supervision, and continued the mother’s supervised visitation. ' He does not brief this separately, but contends that a fair reading of the evidence would show that not he, but KM., was responsible for breaking HP.’s leg. He concludes, somewhat rhetorically, “To the extent that the state is unwilling to recognize that a mother is unable [sic ] to abuse her child, is the maternal preference still,alive?”
DSS responds that on the facts presented, the juvenile court was entitled to take custody away from L.P.
*1194 The court shall not remove a child from the custody of her parents unless her welfare cannot, in the opinion of the court, be adequately safeguarded without such removal. La. Ch. C. art. 682 A. The child’s health and safety is the paramount concern in the court’s consideration of removal. Id. The juvenile court’s conclusions with respect to removal are subject to manifest error review. State in Int. of JB, supra.
At the adjudication hearing, L.P. testified that he would be leaving the state imminently for duty in Phoenix, Arizona; he also mentioned a training period in Alabama. At the disposition hearing, Ms. Gilbert testified that based on her interviews with the parties, L.P. did not plan to marry K.M.; L.P. admitted they were living together only for financial reasons. |7The juvenile court alluded to the anger issues apparent in L.P.’s protective order hearing, military record and in-court demeanor. The court also noted L.P.’s persistent refusal to admit any fault or to accuse K.M. These factors obviously bear on the child’s health and safety and support a finding that removing K.P. from her father’s custody was necessary to safeguard her welfare. La. Ch. C. art. 682 A. We perceive no manifest error.

Conclusion

For the reasons expressed, we affirm the judgment of disposition. Costs are assessed to the appellant, L.P.
AFFIRMED.

. Appointed counsel for K.P. filed a letter adopting DSS’s position in support of the judgment of disposition. K.M. filed a pro forma brief stating that she would not present any argument; instead, she declares, she will work with DSS for the goal of reuniting with her child.